UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-61301-CIV-COHN/SELTZER

BP PRODUCTS NORTH AMERICA INC.,

        Plaintiff,

v.

SUPER STOP #701, INC., a Florida corporation,
and MAHAMMAD A. QURESHI, an individual,

        Defendants.
_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**THIS CAUSE** is before the Court upon a bench trial held before the undersigned

on November 22 and 23, 2009, the parties' proposed Findings of Fact and Conclusions

of Law [DE's 125 and 126], Defendant Mahammad Qureshi's Supplemental Motion for

Directed Verdict as to the Alleged Personal Guarantee [DE 120], Plaintiff's Response to

that motion [DE 123] and Defendant Qureshi's Reply thereto [DE 124].  The Court has

considered the testimony and other evidence presented by both parties at trial and the

applicable law and is duly advised in the premises.  Accordingly, pursuant to the

requirements of Rule 52 of the Federal Rules of Civil Procedure, the Court issues the

following Findings of Fact and Conclusions of Law.

## I.  FINDINGS OF FACT[1]

1.      Super Stop #701, Inc. ("Super Stop"), whose principal is Mahammad A. Qureshi

("Qureshi") (collectively, "Defendants"), owns a gas station and entered into

various agreements with BP Products North America, Inc. ("BP Products" or

"BP"), the successor to Amoco Oil Company.

2.      Qureshi began his business relationship with Amoco in the 1990's.

### Promissory Note

3.      Super Stop and Qureshi entered into a Dealer Supply Agreement ("Agreement")

with Amoco on September 8, 1997 and a Promissory Note on November 4,

1997.  Plaintiff's Exhibit 1.

4.      The Promissory Note was for $450,000, "to be reduced at the end of each year

of the term of the Agreement on a straight line basis at the rate of (8.3%) per

cent per year for each year the Agreement is in effect beginning October 1,

1997.  Id. ¶ 3.

5.      The amount remaining on the Promissory Note is payable at the time the Dealer

Supply Agreement terminates or is not renewed for any reason prior to the

principal amount of the note being completely amortized.  Id. ¶ 4.

6.      BP Products is the successor to Amoco Oil Company, the identified "Lender" on

---

[1] Any of the foregoing factual findings that may represent conclusions of law are adopted as conclusions of law.  In addition, the Court has received proposed findings of fact from both BP Products, Inc. and from Super Stop, #701, Inc.  These documents have been filed in the docket of this case and served on all opposing parties [DE's 125 and 126 (also filed at DE 88 in Case No. 08-CIV-61389)].

the Promissory Note.  Joint Pretrial Stipulation ¶ 5.A. (Uncontested Facts) [DE

109]; <u>see also</u> Testimony of Jeffrey Berning, BP Regional Account Executive at

187 of Transcript [DE 121]; Testimony of Linda Procter, (former) BP Regional

Account Executive at 238 of Transcript [DE 122 at 4].

7.     The amount remaining on the Promissory Note at the time the Dealer Supply

Agreement between Defendants and BP Products terminated on August 4, 2008

was $43,750.00.  Testimony of Jeanne Ryan, BP Credit Analyst at p. 121;

Plaintiff's Exhibit 6 (Termination letter).


**Dealer-Supply Agreement and Sarker/NFH**

8.     The Dealer Supply Agreement ("Agreement") required BP to supply fuel to the

gas station.  Exhibit 1.

9.     Super Stop leased the gas station to a separate company, which in turn

subleased the station to NFH #2 Enterprise, Inc. ("NFH") and NFH's principal

Firoz A. Sarker ("Sarker").  Plaintiff's Exhibit 29, Exhibits A and B.

10.    Sarker operated the gas station without daily input from Qureshi.

11.    The lease made by Defendants and the sublease to Sarker and NFH were never

approved by BP.

12.    The Agreement gave BP the right to approve any sublet and assignment of any

interest in the Agreement.  Exhibit 1 ¶ 25.

13.    Sarker received dealer training from BP at its headquarters in Illinois in

September of 2001.  Defendant's Exhibit 1, Deposition Testimony of Joseph

Seeger at pp. 11-14.

14.   BP records state that  Sarker attended dealer training as a "Dealer-Candidate."

Id.

15.   BP never approved Sarker as the dealer of record.

16.   In 2006, a dealer-candidate, before becoming a dealer of record, must undergo

a credit check, background check, and submit a valid piece of identification to a

BP field representative.  Testimony of Jeanne Ryan.

17.   In addition, to transfer an existing station from a Dealer to a new Dealer, a

closing must take place wherein an administrative transfer fee of $10,000 must

be paid, the outgoing dealer must pay any outstanding balances to BP, and the

new Dealer must submit a Business Risk Deposit.  None of these requirements

were met by Sarker.  Testimony of Jeanne Ryan.

18.   BP's Regional Account Executives for South Florida, the liaison between the

dealers and BP, believed Sarker was the station manager of the gas station.

19.   Defendants employed managers at each of their BP stations.  Testimony of

Linda Proctor at 242-243 of Transcript [DE 122 at pp. 8-9].

20.   The Electronic Delivery Dealer Plan Agreement ("EDDP") between BP and

Defendants required payment for fuel deliveries on a pay as you go basis via

Electronic Funds Transfer ("EFT").  Plaintiff's Exhibit 3 ¶ 6(a).

21.    The Dealer presented BP with bank account information from which the EFT

payments for fuel were made.  Id. ¶ 6(d); Testimony of Jeffrey Berning at pp.195-

196 [DE 121] and of Linda Procter at pp. 300-01 [DE 122 at 66-67].

22.   Jeffrey Berning, then the Regional Account Executive ("RAE") with responsibility for the geographic area including the station, personally confirmed with Mr. Qureshi a bank account change in September of 2007.  Transcript at 196.

23.   The accounts from which payments were made may have been accounts under the control of Sarker and/or NFH, though no bank account information is in the record of this case.

24.   There was no evidence that BP verified the ownership of the account designated by Defendants for the payment of fuel, nor was there evidence that the agreements between the parties required such verification.

25.   The EDDP prohibited Defendants from assigning the EDDP Agreement without written prior consent of BP.  Exhibit 3 ¶ 12.  No such consent is in the record.


**Unpaid Fuel Bills**

26.   Pursuant to the Agreement and the EDDP, BP delivered fuel to Defendants' gas station for which Defendants agreed to pay.  Exhibits 1 and 3.

27.   The price to be paid for the fuel was to be determined by BP's "dealer buying price" in effect in that pricing area at the time of loading of the fuel.  Agreement ¶ 3.

28.    Various bills for delivered fuel went unpaid during the period June 27, 2008 through July 7, 2008.  Plaintiff's Exhibits 8 through 28 (invoices and bills of lading); Testimony of Jeanne Ryan.

29.   The unpaid balance of the bills was $511,953.58.  Testimony of Jeanne Ryan at

p. 122.[2]

30.  The EDDP Agreement allowed BP to invoice Defendants for amounts due via electronic means.  Exhibit 3 ¶ 6(c).

31.  BP caused such invoices and notices of amounts due to be electronically delivered to Defendants.  Testimony of Jeanne Ryan.

32.  Any alleged delay in BP's decision to terminate fuel deliveries to Defendants was satisfactorily explained by Jeanne Ryan due to normal delays in billing of diesel fuel and the July 4th holiday weekend.

33.  On Monday, July 7, 2008, after being telephoned by Jeanne Ryan regarding the lack of payment, Jeffrey Berning, BP's RAE, attempted to call Sarker, upon prior instruction of Defendant Qureshi.  Id. at 197.

34.  Berning did not reach Sarker, but did speak with Qureshi by telephone.  Qureshi did not know about any insufficient funds notices and stated that he would try to find Sarker and get back with Berning.  Id. at 198.  Qureshi did not get back to Berning.

35.  Jeffrey Berning, on behalf of BP, attempted to ascertain what was occurring at the station on July 7, 2008.  Upon visiting the location, Berning found the station operating and selling gas with a clerk who could not tell him where Sarker was

---

[2]  The Court sustained Defendants' objections to introduction into evidence of the insufficient funds notices from Citibank ("NSF's").  Exhibits 34-38.  However, the documentary evidence of the invoices and bills of lading, when combined with the testimony of Jeanne Ryan, a credit analyst for BP,  that these bills were not paid, supports the factual finding that the balance on the Defendants' open account is unpaid.

located.  Testimony of Jeffrey Berning at 198.

36.     On July 14, 2008, Jeanne Ryan sent letters to Defendants informing them of

        violations of the EDDP because of insufficient funds notices and unpaid fuel bills

        and of being placed on prepay status before more deliveries could be made.

        Exhibits 32 and 33.

37.     On July 28, 2008, BP sent a termination notice to Defendants ending the Dealer

        Supply Agreement as of August 4, 2008 because of multiple electronic payment

        drafts returned as unpaid and the failure to sell gasoline between July 8, 2008

        and July 28, 2008.  Plaintiff's Exhibit 6.


**Unpaid Re-image Program Funds**

38.     Defendant Super Stop and Plaintiff BP entered into an "Investor/Owner Re-

        Image Program Contract" on July 23, 2003.  Plaintiff's Exhibit 43.

39.     This contract provided funds by BP to the station for re-image improvements,

        with Super Stop to pay back the funds if the Dealer Supply Agreement

        terminates, according to a formula contained with the Re-Image Contract.

        Exhibit 43 ¶ 6(a).

40.     Linda Proctor testified that the station had problems with the BP image, due to

        an unenclosed dumpster, old junk cars and U-Haul trucks on the property.

        Transcript at 264 [DE 122 at 30].

41.     Jeanne Ryan testified that the amount due and owing on the Re-Image Contract

        at the time of termination of the Dealer Supply Agreement was $13,846.80.

Transcript at 127-129 [DE 121].

## **BP Equipment Remaining at Station**

42.   Jeanne Ryan testified that the value of BP equipment that remains due and owing BP from the station was $8,742.00.  Transcript at 130.

43.   This equipment consisted of a satellite and the Ruby POS, point of sale system with the printer.  Id.

44.   Jeffrey Berning testified that he saw this equipment at the station on July 7, 2008.  Transcript at 198 [DE 121].

45.   Berning was not able to retrieve the equipment at the time of de-branding in August of 2008 because Qureshi would not allow him into the building to retrieve the equipment.  Id. at 200.


## **Personal Guarantee by Qureshi of Super Stop's Debt to BP**

46.   The Dealer Supply Agreement is renewed each three years.

47.   On October 10, 2006, Linda Procter and Mahammad Qureshi met for two hours to sign a renewal of the Dealer-Supply Agreement for the period October 1, 2006 through September 30, 2009.  Testimony of Linda Proctor at p. 245-255  [DE 122 at 11-18].

48.   When Ms. Proctor arrived at Mr. Qureshi's offices (not located at any of his service stations), Mr. Qureshi's attorney was also present.

49.   Mr. Qureshi had crossed out several instances of his name in the document and substituted "Super Stop #701" in its place.  Exhibit 44.

8

50.   Linda Proctor testified that she initialed all of the changes after she consulted with the Leasing Department at BP.  Transcript at 272  [DE 122 at 38].

51.   Proctor testified that Qureshi wished to have these contracts be similar to his previous ones which had Super Stop 701 listed as the Dealer.  Transcript at 275.

52.   This was the first time Ms. Proctor had signed documents with Mr. Qureshi and the first time she encountered a corporation as a named Dealer.

53.   A second document executed at that time was the "Rider" to the Agreement.

54.   Proctor testified that she agreed to all of the changes adding Super Stop because the Rider identified Qureshi as the Dealer-Principal which meant he was personally guaranteeing the debts of Super Stop, a fact she stated she told him at that time.  Transcript at 280 [DE 122, p. 46].

55.   BP required that a corporation identified as a Dealer have a personal guarantee executed as well.  Id. at 280, 285

56.   The Rider agreement defined "Dealer" as Super Stop #701 and "Dealer-Principal" as Mahammad Qureshi.  The Rider agreement includes a provision that the "Dealer-Principal personally guarantees payment of the debts, if any, owed to BP by the Dealer incident to the Dealer's use of the facility in connection with the Supply Agreement and any dealings with BP relative thereto."   Rider ¶ 3, Exhibit 44 (Bates SS 0057- 0059) and Exhibit 2.

57.   The Rider contains three separate signature blocks, one for BP, one for the "Dealer" and one for the "Dealer-Principal."  Exhibit 2 and Exhibit 44.

58.   On the documents executed on October 10, 2006, Qureshi signed on behalf of

9

Super Stop in both the Dealer block and the Dealer-Principal block.  Exhibit 44.

59.  The documents signed on October 10, 2006 were not accepted by BP's corporate office.

60.  The contracts were retyped without the various cross-outs and re-executed by Proctor and Qureshi on June 27, 2007, in Qureshi's office during a 30 minute meeting also attended by Jeffrey Berning, the incoming RAE.  Exhibits 1 and 2; Testimony of Proctor and Berning.

61.  Both Proctor and Berning testified that Qureshi made no objection to his personal guarantee in the Rider agreement.

62.  In the Rider, Mahammad Qureshi is defined as the "Dealer-Principal," the same guarantee language appears in paragraph 3, but the Dealer-Principal signature block is blank.  However, Qureshi signed the document in the Dealer signature block as President of Super Stop, Inc.  Exhibit 2.

63.  Proctor testified that two signatures are required only when the Dealer has a partner.  Transcript at 288-89 [DE 122, p. 54-55].

64.  On July 10, 2008, Qureshi submitted an affidavit to the Broward Sheriff's Office alleging that Sarker was responsible for taking the proceeds of the fuel sales from the station.  Exhibit 29.  Qureshi stated in the document that he personally guaranteed the payment of debts to the fuel supplier. ¶ 5, Exhibit 29.[3]

---

[3]  The Qureshi Affidavit was initially objected to during trial when first introduced during the testimony of Jeanne Ryan.  Transcript at 131-32.  Ms. Ryan testified that she recognized Mr. Qureshi's signature from BP documents that he had signed. Id. at 132. After further argument from counsel, the Court received the exhibit into evidence, as the affidavit was a statement of a party opponent whose signature was authenticated by

## II.  CONCLUSIONS OF LAW[4]

BP's amended complaint against Super Stop and Qureshi in Case No. 08-61301-Civ contains the following claims:  breach of contract (franchise agreement), account stated, open account, breach of contract (re-image program), breach of contract (promissory note), conversion (of certain equipment), replevin (of that equipment), and breach of the personal guarantee ("Rider") signed by Qureshi.

The Court has diversity jurisdiction in this action as there is complete diversity of citizenship and the amount in controversy exceeds $75,000 exclusive of interest and costs.  Defendants argue that venue in federal court is improper due to a venue clause in the 1997 Promissory Note that any action to enforce the note by either Lender or Borrower "shall be brought exclusively in the State of Florida, before the Circuit Court, in and for the County of Broward, Florida. . . ."  Exhibit 5, ¶ 13(ii).  However, this clause would only govern the action on the promissory note and not the other claims. Because the other claims are properly before this Court as they are not subject to this

---

Ms. Ryan.  Id. at 133-34.  Counsel for Defendants withdrew his objection just prior to the exhibit being received into evidence, stating, "the affidavit is going to come in at some point anyway, so why not now."  Id. at 135.  Defendants now argue after trial that this concession was based upon counsel's good faith belief that Mr. Qureshi was "likely" to be called at trial by Plaintiff.  Because Mr. Qureshi was not called by Plaintiff, and Defendants chose not to call Mr. Qureshi themselves, Defendants assert that the Court should revisit its evidentiary ruling.  The Court sees no reason to revisit the ruling.  Even if Defendants could resurrect their objection, which clearly was waived, the Court had gone almost all the way on the record to overruling the objection anyway, as the signature was authenticated and the affidavit is a statement of a party opponent that is outside the hearsay rule.

[4]  Any of the foregoing conclusions of law that may represent findings of fact are adopted as findings of fact.

venue clause, the Court will exercise a form of supplemental jurisdiction over the claim on the Promissory Note.[5]

### A.  Unpaid Fuel Bills -- Breach of Dealer Supply Agreement

There is little dispute that a valid contract existed in the form of the Dealer Supply Agreement and the EDDP, whereby BP agreed to supply fuel to Defendants in return for payment for that fuel at then market prices set by BP.  The Agreement contained various other provisions described above that governed the actions of the parties.   BP has proven by more than a preponderance of the evidence that Defendants breached the Agreement by failing to pay for BP branded motor fuel sold and invoiced to Defendants and delivered to the station.  The EDDP provided that BP had only to invoice Defendants by electronic means.

Super Stop asserts that the doctrine of equitable estoppel prevents BP from now enforcing the agreements against Super Stop because BP had been accepting payments from Sarker, a BP-trained Dealer-candidate, from an electronic funds transfer account capable of paying BP directly, and that BP acknowledged and approved of Sarker as a tenant and operator of the station.  The Court disagrees.

Super Stop must prove the elements of equitable estoppel, which are "(1) a representation as to a material fact that is contrary to a later-asserted position, (2) reliance on that representation, and (3) a change in position detrimental to the party claiming estoppel, caused by the representation and reliance thereon.  State v. Harris,

---

[5]  If this conclusion is in error, than the claim on the promissory note would be dismissed for improper venue, and $43,750 would be subtracted from the judgment.

12

881 So. 2d 1079, 1084 (Fla. 2004).  Defendants assert that BP chose to deal directly
with Sarker at the station and accepted payment for fuel for years from a bank account
controlled by Sarker, that Defendant detrimentally relied upon BP's actions in turning
over operation of the station to Sarker by not monitoring the fuel payments.  The
problem with this argument is that the evidence at trial was that BP dealt with Sarker as
the *manager* of the station, not the Dealer.  There is no documentation that Sarker took
over as the Dealer at the site from BP's perspective or met any of the BP new Dealer
requirements, other than the fact that Sarker went to BP Dealer training in 2001.  The
bank account information was supplied to BP from Qureshi.  While it is possible that BP
allowed the hands-off approach of Defendants to the management of the station in
order to maximize its own profits, the Court concludes that Defendants have not
established a reasonable equitable estoppel defense to preclude BP from obtaining
payment from the Defendants for the unpaid fuel delivered pursuant to agreements
signed by Defendants.  Therefore, Defendants are liable for the entire amount of
unpaid fuel delivered to the station in the amount of $511,953.58 in Count I of the
Amended Complaint.

BP has asserted alternative claims for account stated (Count II) and open
account (Count III).  "For an account stated to exist, there must be an agreement
between the parties that a certain balance is correct and due and an express or implicit
promise to pay this balance."  First Union Discount Brokerage Services, Inc. v. Milos,
997 F.2d 835, 841 (11th Cir. 1993) (quoting Carpenter Contractors of Am., Inc. v.
Fastener Corp. of Am., Inc., 611 So. 2d 564, 565 (Fla. Dist. Ct. App. 1992).   This

standard does not describe the situation of this case as there has not been an agreement between the parties that a certain balance is due.  Therefore, the Court will not grant relief as to Count II.

> In commercial transactions:
>
> an "open account" should refer to an unsettled debt, arising from items of work or labor, goods sold and other open transactions not reduced to writing, the sole record of which is usually the account books of the owner of the demand.  It should not include express contracts or other obligations that have been reduced to writing.

H & H Design Builders, Inc. v. Travelers Indem. Co., 639 So.2d 697, 700 (Fla. Dist. Ct. App. 1994).  In this case, there was an agreement between the parties for BP to supply fuel to Defendants' gas station.  However, there was no fixed price in the contract, although the price was described as being BP's dealer pricing in effect for the geographic area at the time of loading of the fuel.  To the extent this is an omitted material term, the Court concludes that Plaintiff has a valid equitable claim for the amount of $511,953.58 because Plaintiff has submitted sufficient billing and delivery records to support an open account claim.  These damages of unpaid fuel bills as to Count III are the same as in Count I.

## B.  Unpaid Re-image Program Funds

In Count IV of its Complaint, Plaintiff asserts a breach of contract claim for the unpaid amounts owed under the parties' "Investor/Owner Re-Image Program Contract." The Court concludes that Plaintiff has proven by a preponderance of the evidence described above that Defendants are in default and breach of that agreement.  Thus,

Plaintiff is entitled to a judgment on this claim in the amount of $13,846.80.

### C.  Promissory Note

In Count V of its Complaint, Plaintiff asserts a breach of contract claim for the unpaid amounts of the Promissory Note from 1997.  Defendants argue that BP has failed to show that it is a party to the Note.  However, as noted in ¶ 6 *supra*, BP Products is the successor to Amoco Oil Company, the identified "Lender" on the Promissory Note.  Defendants also assert that witness Jeanne Ryan, a BP credit analyst, is not competent to testify as to how the remaining balance of the original $450,000 balance was amortized and what was the precise interest rate used.

The plain terms of the Note indicate that the original amount is subject to a 7% interest rate or the highest amount permitted by law, whichever is lower.  Exhibit 5, ¶ 2. The Court concludes that 7% is lower than the highest amount permitted by law, despite the lack of testimony on this side issue.  The Note further states that repayment is made by reducing the amount of the loan by 8.3% at the end of each year.  This formula would explain how the $450,000 was reduced over eleven (11) years.  Jeanne Ryan is competent to testify about the result of the calculation of that amount.  The Court therefore concludes that Plaintiff has proven by a preponderance of the evidence that Defendants still owe $43,750.00 on the original $450,000 promissory note.

### D.  Conversion and Replevin of Property

Plaintiff seeks damages for conversion of their point of sale machine, printer and

satellite equipment remaining at the station after termination of the Dealer Supply

Agreement in Count VI, and also replevin of this equipment in Count VII.  The elements

of conversion in Florida are as follows: "(1) an act of dominion wrongfully asserted; (2)

over another's property; and (3) inconsistent with his ownership therein."  Special

Purpose Accounts Receivable Co-op Corp. v. Prime One Capital Co., 125 F. Supp. 2d

1093, 1099-1100 (S.D.Fla. 2000), citing Warshall v. Price, 629 So. 2d 903, 904 (Fla.

Dist. Ct. App. 1993), rev. den., 641 So. 2d 1346 (Fla. 1994).  Upon a review of the

testimony supporting this claim, the Court concludes that Plaintiff has proven by a

preponderance of the evidence that Defendants have wrongfully retained the printer,

point of sale machine and satellite equipment that rightfully belong to BP and not

Defendants.  Defendants must return the equipment and pay damages for their

conversion.

Florida statutes allow a claim for replevin where "personal property is wrongfully

detained by another person."  A plaintiff may obtain a writ of replevin to recover the

property and "any damages sustained by reason of the wrongful taking or detention as

herein provided."  Fla. Stat. § 78.01 (West 2009); Campos v. Courtesy Ford, Inc., 900

So. 2d 707, 708 (Fla. Dist. Ct. App. 2005).  Other than the value of the property, BP

has not provided any evidence of damages of the use of the property in question.

Campos, 900 So. 2d at 708.  Therefore, the Court will enter a writ of replevin for return

of the property, but not additional damages on top of the conversion damages testified

to by Jeanne Ryan.[6]

### E.  Personal Guarantee

The remaining claim in Count VIII of Plaintiff's Amended Complaint is to enforce the personal guarantee against Defendant Qureshi to obtain a judgment against him personally for all damages assessed to Super Stop, Inc., the Dealer of record.

In addition to the issue being contested at trial, Defendant Qureshi moved for a directed verdict on BP's claim regarding the personal guarantee and filed a supplemental motion for a directed verdict on this claim.  The Court will deny the Rule 52(c) motion for judgment on partial findings, as the Findings of Fact preclude such relief.  Rather, the Court will decide the issue on the full record of the case.

Plaintiff bases its claims on 1) Mr. Qureshi's signature as Dealer, 2) the Rider that defines Mr. Qureshi as the Dealer-Principal, and 3) the Dealer-Principal's personal guarantee of the debts owed to BP by the Dealer, Super Stop.  Rider, Exhibit 2, ¶¶ 1,3. BP argues that Florida case law clearly states that a principal of a corporation cannot avoid personal liability for an agreement imposing personal liability by stating after the fact that he did not intend to be bound.  Great Lakes Prods., Inc. v. Wojciechowski, 878 So. 2d 418, 419 (Fla. Dist. Ct. App. 2004); Lab. Corp. of America v. McKown, 829 So. 2d 311, 313 (Fla. Dist. Ct. App. 2002); Robert C. Malt & Co. v. Carpet World Distrib's,

---

[6] The Court recognizes the potential for an argument by Defendants that granting both a writ of replevin to return the property plus damages for conversion of the property is double counting of damages.  However, BP is certainly entitled to return of their equipment under the replevin statute as well as damages for conversion of its property.  The lack of objection to the amount of recovery by Defendants means a double-counting argument on these grounds is waived.

Inc., 763 So. 2d 508, 510 (Fla. Dist. Ct. App. 2000).  Each of these cases stand for the proposition that if a document's clear purpose is to impose a personal guarantee, the signature of a corporate principal can personally bind that principal even if he adds his corporate title to his signature.

In a pre-trial ruling, the Court concluded that summary judgment was not appropriate on BP's claim under the Rider for personal liability because the Dealer-Principal signature block is blank and therefore the Rider as executed contains a latent ambiguity as to whether Qureshi intended to be personally bound.  The Court therefore considered extrinsic parole evidence to determine the intent of the parties.  Ace Electric Supply Co. v. Terra Nova Electric, Inc., 288 So.2d 544, 547-48 (Fla. Dist. Ct. App. 1973).

Qureshi continues to argue that the contract evidence is clear that Qureshi did not intend to be personally bound by the Rider and the extrinsic evidence supports this conclusion.  Qureshi relies upon United Refrigeration, Inc. v. Evercool Air Conditioning, Inc., a case similar to the case at bar because the loan agreement at issue contained two signature lines: "one for the name of the guarantor, and another for the signature of the individual guarantor." 593 So. 2d 1192, 1193, n.2 (Fla. Dist. Ct. App. 1992).  The owner and president of Evercool, Burrell, signed the loan only as president of the corporation, and refused to sign in the space for the "individual guarantor."  Id.  The court held that the document was ambiguous but that there was substantial evidence that the parties understood that Burrell did not intend to be personally liable.  United's credit manager testified that he was aware at the time of signing that Burrell would not

incur individual liability because he did not sign the loan application above the line marked, "individually."  Id.

BP argues that the record in this case, unlike in United Refrigeration, contains neither a contemporaneous objection by Qureshi regarding the Rider's effect on his being individually bound by the Rider, nor an acceptance by the creditor (BP) of such objection.  In addition, BP argues that the affidavit of Qureshi supplied to the Broward Sheriff's Office in July of 2008 confirms that Qureshi recognized he was in fact personally liable. This recognition of liability cannot be ignored.[7]

The testimony of Jeffrey Berning and Linda Proctor also support BP's argument that there was no contemporaneous objection by Qureshi.  Defendants argue, however, that the original draft of the 2006 Dealer Supply Agreement that was marked up by Qureshi just prior to and during the October 10, 2006 meeting with Linda Proctor shows contemporaneous objections by Qureshi to his personal liability.  Plaintiff's Exhibit 44. Although Qureshi's unspoken intent may have been to make such an objection, the final version of the document from June of 2007 (Plaintiff's Exhibit 2) contains the plain language of the Rider that 1) the Dealer-Principal personally guarantees the debts of the Dealer; 2) Mahammad Qureshi is defined as the Dealer-Principal; and 3) Mahammad Qureshi signed the document -- even though he signed the document only

---

[7]  Defendants argue forcefully that the affidavit should not have been admitted, and even if admitted, is not proper parole evidence because the affidavit was prepared over one year after the contracts were signed.  The Court concludes that BP has met its burden to show that Qureshi is personally liable even without resort to the 2008 affidavit.

in the space provided for the "Dealer" as president of Super Stop.[8]

Although a close question, the Court concludes that Plaintiff has proven by a preponderance of the evidence that Mahammad Qureshi personally guaranteed the debts of Super Stop owed to BP via the Rider.  Plaintiff's Exhibit 2.  The evidence reveals that 1) BP never intended to accept contracts with Super Stop as the Dealer without a personal guarantee by Mr. Qureshi, 2) BP never accepted any version of the contracts without the guarantee, and 3) BP specifically told Mr. Qureshi (via Linda Proctor) at the time of signing of the Rider that he must be personally liable if Super Stop is considered the Dealer.  Although Defendants make a valid argument that BP chose to continue the profitable business relationship and accept the Rider without Qureshi's signature in the Dealer-Principal block, the Court concludes that after hearing the testimony and reviewing the full record presented, Plaintiff nonetheless has proven that the contracts and the evidence of intent of the parties show that the Rider does obligate Mr. Qureshi to be liable for the debts of Super Stop to BP.

Therefore, pursuant to the relief requested in Count VIII of the Amended Complaint, the judgment in this case for all of the damages will be joint and several against both Super Stop, Inc. and Mahammad Qureshi.

---

[8]  Because this dispute revolves around the parties' intent as to individual liability, a latent ambiguity, the Court can reject Defendants' argument that the contract simply be construed against the drafter, Plaintiff BP.  There is no patent ambiguity here regarding the language of the contracts, rather a dispute regarding the parties' intent.

20

## III. CONCLUSION

Based upon the foregoing factual findings and legal analysis, it is **ORDERED**

**AND ADJUDGED** as follows:

1.     Defendant Mahammad Qureshi's Supplemental Motion for Directed Verdict as to

the Alleged Personal Guarantee [DE 120] is hereby **DENIED**;

2.     The Court will enter a joint and several judgment in favor of BP and against both

Defendants.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County,

Florida, this 17th day of December, 2009.

JAMES I. COHN
United States District Judge

Copies furnished to:

Mark Blumstein, Esq.
Justin Leto, Esq.
Tracy Newmark, Esq.